PRO BONO
No. 21-16706

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEJUAN MARKEISS HOPSON,

*Plaintiff-Appellee,*

*v.*

JACOB ALEXANDER; BRANDON GRISSOM,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Arizona
No. 2:20-cv-00128-SMB-DMF, Hon. Susan M. Brnovich

**PLAINTIFF-APPELLEE DEJUAN MARKEISS HOPSON'S
PETITION FOR PANEL REHEARING AND REHEARING EN BANC**

OREN NIMNI
RIGHTS BEHIND BARS
416 Florida Avenue, NW, Unit #26152
Washington, DC 20001
(202) 540-0029

MARY V. SOOTER
MARGARITA BOTERO
JAKE C. BROWNELL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1225 Seventh Street, Suite 2600
Denver, CO 80202
(720) 274-3133

*Attorneys for Plaintiff-Appellee
Dejuan Markeiss Hopson*

July 31, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................... ii

RULE 35(B)(1) STATEMENT ........................................................1

FACTUAL AND PROCEDURAL BACKGROUND .............................................4

ARGUMENT .........................................................................5

I.    REHEARING IS NECESSARY TO CLARIFY THAT COURTS MUST ANALYZE THE GRAHAM FACTORS IN EXCESSIVE FORCE CLAIMS ....................5

II.   REHEARING IS NECESSARY TO CLARIFY THAT, AT SUMMARY JUDGMENT, A NON-MOVANT IS NOT REQUIRED TO CONTEST EVERY STATEMENT MADE BY THE MOVING PARTY ......................................11

III.  REHEARING IS NECESSARY TO RESOLVE A CONFLICT BETWEEN THE PANEL MAJORITY'S DECISION AND THIS COURT'S PRECEDENT REGARDING THE USE OF FORCE DURING TERRY STOPS .........................................................16

CONCLUSION ......................................................................18

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ames v. King County*,
    846 F.3d 340 (9th Cir. 2017) ...................................................................10

*Andrews v. City of Henderson*,
    35 F.4th 710 (9th Cir. 2022) ..................................................................11

*Bryan v. MacPherson*,
    630 F.3d 805 (9th Cir. 2010) ....................................................................7

*Cunningham v. City of Wenatchee*,
    345 F.3d 802 (9th Cir. 2003) ..................................................................13

*Felarca v. Birgeneau*,
    891 F.3d 809 (9th Cir. 2018) ...........................................................1, 7, 10

*Goodman v. Diggs*,
    986 F.3d 493 (4th Cir. 2021) ..................................................................14

*Graham v. Connor*,
    490 U.S. 386 (1989) .........................................................................1, 7, 10

*Green v. City and County of San Francisco*,
    751 F.3d 1039 (9th Cir. 2014) .......................................................3, 16, 17, 18

*Hammer v. Gross*,
    884 F.2d 1200 (9th Cir. 1989) ...................................................................6

*Illinois v. Wardlow*,
    528 U.S. 119 (2000) .................................................................................7

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) ...............................................................12, 13

*Martinez v. Stanford*,
    323 F.3d 1178 (9th Cir. 2003) .........................................................2, 12, 13

*Raiche v. Pietroski*,
    623 F.3d 30 (1st Cir. 2010) ......................................................................8

*Rainwater v. Alarcon*,
  268 F. App'x 531 (9th Cir. 2008) ........................................................14

*Rand v. Rowland*,
  154 F.3d 952 (9th Cir. 1998) ...............................................................13

*Rogoz v. City of Hartford*,
  796 F.3d 236 (2d Cir. 2015) ...................................................................8

*Schroeder v. McDonald*,
  55 F.3d 454 (9th Cir. 1995) .................................................................14

*Shafer v. County of Santa Barbara*,
  868 F.3d 1110 (9th Cir. 2017) ...............................................................7

*Smith v. City of Hemet*,
  394 F.3d 689 (9th Cir. 2005) .................................................................1

*Terry v. Ohio*,
  392 U.S. 1 (1968) ................................................................2, 7, 11

*Thomas v. Ponder*,
  611 F.3d 1144 (9th Cir. 2010) .............................................................14

*Tolan v. Cotton*,
  572 U.S. 650 (2014).....................................................................4, 11

*Turmon v. Jordan*,
  405 F.3d 202 (4th Cir. 2004) .................................................................8

*Washington v. Lambert*,
  98 F.3d 1181 (9th Cir. 1996) ...........................................3, 16, 17, 18

*Williams v. Griffin*,
  952 F.2d 820 (4th Cir. 1991) ...............................................................14

## STATUTES, CONSTITUTIONAL PROVISIONS, AND RULES

42 U.S.C. § 1983 .....................................................................................5

U.S. Const. amend. IV ..............................................................2, 3, 8, 16

Fed. R. App. P. 35(a) ...............................................................................1

# RULE 35(B)(1) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 35(a), Appellee Dejuan Markeiss Hopson respectfully petitions for panel rehearing and rehearing en banc of the panel opinion reversing the district court's denial of summary judgment of qualified immunity on Mr. Hopson's excessive force claim. The panel's published opinion conflicts with decisions of the Supreme Court and this Court and involves a question of exceptional importance. Rehearing is necessary to secure and maintain uniformity of the Court's decisions.

***First***, as Judge Rawlinson explained in her "emphatic[] dissent," the majority's decision conflicts with the Supreme Court's holding in *Graham v. Connor*, 490 U.S. 386 (1989), and this Court's decision in *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018). *See* Op. 34 (Rawlinson, J., dissenting). *Graham* and *Felarca* require courts reviewing excessive force claims to balance the intrusion into an individual's rights against countervailing governmental interests through the use of relevant factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Felarca*, 891 F.3d at 817 (quoting *Graham*, 490 U.S. at 396). This Court has reiterated that it is "necessary" to analyze the *Graham* criteria in excessive force cases. *Smith v. City of Hemet*, 394

F.3d 689, 701 (9th Cir. 2005).

The majority, however, failed to apply the *Graham* factors. Instead, the majority nebulously asked whether the "officers could have reasonably suspected that [Mr. Hopson] was engaged in criminal activity and that he was armed and dangerous"—ignoring the need to analyze whether Mr. Hopson in fact posed an immediate threat. Op. 12. As Judge Rawlinson explained in her dissent, the test applied by the majority is akin to the lower standard for evaluating the constitutionality of investigative stops—not the use of force—outlined in *Terry v. Ohio*, 392 U.S. 1 (1968). *See* Op. 43 (Rawlinson, J., dissenting). The panel's application of a test for investigative stops to a case like this one, where there is a claim of "gratuitous or violent" force, erroneously dilutes the rights enshrined in the Fourth Amendment. *See id.* at 50.

**Second**, Mr. Hopson also seeks rehearing because, as Judge Rawlinson observed, the majority's decision conflicts with this Court's decision in *Martinez v. Stanford*, 323 F.3d 1178 (9th Cir. 2003). *See* Op. 39 n.3 (Rawlinson, J., dissenting). Under *Martinez*, in the qualified immunity context, a non-movant at summary judgment "has no burden to 'contest' any version of the facts advanced by the [movant]." *Id*. (citing 323 F.3d at 1183). Instead, the burden remains with the movant to show that there is no triable issue when the evidence is viewed in the light most favorable to the non-movant. *Martinez*, 323 F.3d at 1182, 1184. The

majority, however, improperly resolved material disputes in favor of the officers based on their declarations alone and required Mr. Hopson to contest each of the officers' assertions individually. *See, e.g.*, Op. 15 ("Hopson has not contested [the officers' statement] that he and Jones exchanged items or that Jones went back to his vehicle to retrieve something."). This represents a clear departure from this Court's precedent and threatens to impose significant new burdens on litigants— particularly incarcerated pro se litigants—seeking access to the courts.

**Third**, Mr. Hopson seeks rehearing because the panel majority's decision contradicts this Court's decisions in *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996) and *Green v. City and County of San Francisco*, 751 F.3d 1039 (9th Cir. 2014). *Washington* and *Green* both presented analogous factual circumstances, in which officers pointed guns at and forcibly detained suspects despite lacking "specific information" that the suspects posed a threat or were engaged in a dangerous crime. *See Washington*, 98 F.3d at 1192; *Green*, 751 F.3d at 1052. In both cases, this Court denied the officers' qualified immunity claims and held that, even where officers may have reasonable suspicion to effect a *Terry* stop, "drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment" under ordinary circumstances. *See Washington*, 98 F.3d at 1187. Rehearing is necessary to ensure that this Court adheres to its own precedent and consistently applies the law of *Washington* and *Green* to cases with clear factual

overlap.

The petition for panel rehearing and rehearing en banc should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On January 25, 2018, Mr. Hopson parked his vehicle in front of a gas station and had "a private conversation" with another man, Mr. Jones. ER-69. Appellant Jacob Alexander ("Alexander"), a police detective driving an unmarked car, "parked his vehicle directly behind [Mr. Hopson's] vehicle to prevent [Mr. Hopson] from leaving and, without announcing that he was a police officer, approached [Mr. Hopson] at gunpoint." *Id.* "[W]ithout any provocation or resistance from [Mr. Hopson]," Alexander "opened [Mr. Hopson's] driver's side door" and "forcefully removed [Mr. Hopson] from the vehicle." *Id.* Alexander "placed his hand on [Mr. Hopson]'s left arm and grabbed it with such force that [Mr. Hopson] was 'put … in a state of shock' and thought he was being robbed." *Id.* During the encounter, Appellant Brandon Grissom ("Grissom"), also a police detective, stood with a gun pointed directly at Mr. Hopson "as if to challenge [Mr. Hopson] to resist so [Grissom] could shoot [Mr. Hopson]." *Id.* Alexander forcefully placed Mr. Hopson in handcuffs and "verbally dared [Mr. Hopson] to make a move in resistance to his actions." *Id.* Mr. Hopson did not resist and did

---

[1] The facts stated herein are stated in the light most favorable to Mr. Hopson. *See Tolan v. Cotton*, 572 U.S. 650, 655-656 (2014).

not "verbally or physically threaten" the officers. *Id.* Appellants did not identify themselves as police officers before drawing their weapons on Mr. Hopson and forcibly removing him from his vehicle. *Id.*

When Appellants approached Mr. Hopson's car with guns drawn, they did not believe that Mr. Hopson had committed any crime, "only *suspected* that [Mr. Hopson] *might* commit a crime," and did not believe "that [Mr. Hopson] had a weapon or that he otherwise posed a threat to their safety or the safety of others." ER-18-19. They merely suspected that Mr. Hopson was engaged in unspecified "criminal activity." ER-47.

As relevant here, Mr. Hopson sued Appellants under 42 U.S.C. § 1983 for excessive force in violation of the Fourteenth Amendment. The district court denied Appellants' motion for summary judgment of qualified immunity, ruling that—taking the facts in the light most favorable to Mr. Hopson—each of the factors outlined in *Graham* favored Mr. Hopson, such that key factual disputes remained. ER-16-22. In a published opinion, a majority of a panel of this Court reversed the denial of qualified immunity, over Judge Rawlinson's dissent.

## ARGUMENT

### I. REHEARING IS NECESSARY TO CLARIFY THAT COURTS MUST ANALYZE THE *GRAHAM* FACTORS IN EXCESSIVE FORCE CLAIMS

As Judge Rawlinson explained in her dissent, this Court's decision in *Felarca* requires courts considering excessive force claims to analyze each of the

factors outlined by the Supreme Court in *Graham*.  Op. 40 (Rawlinson, J.,

dissenting).  These factors include "the severity of the crime at issue, whether the

suspect poses an *immediate* threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*.

(quotation marks omitted).  A court may also "consider the availability of less

intrusive alternatives to the force employed and whether warnings were given."  *Id*.

"[T]he most important [factor] is whether the suspect posed an *immediate threat* to

the safety of the officers or others."  *Id*.  This Court has recognized for decades that

each of these factors must be analyzed when evaluating an excessive force claim.

*See Hammer v. Gross*, 884 F.2d 1200, 1205-1206 (9th Cir. 1989) (explaining that

the Supreme Court had recently "announced a set of principles for testing the

'reasonableness' of a particular use of force in the course of an arrest" in *Graham*

and applying those principles to excessive force claims).

The panel majority, however, failed to engage with the *Graham* factors in

analyzing Mr. Hopson's excessive force claim.  Specifically, the majority only

analyzed the first *Graham* factor (the severity of the supposed crime).  Op. 13.  On

that basis alone, it concluded that the officers reasonably believed that Mr. Hopson

was about to engage in an armed robbery and that this suspicion alone justified the

amount of force used, without regard to whether there was an immediate threat,

whether Mr. Hopson was resisting or attempting to evade arrest, or whether less intrusive alternatives were available.  *Id.* at 18.

The majority effectively substituted the required *Graham* factors with *Terry*'s test for a "brief, investigatory stop."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).  In general, an officer may conduct a *Terry* stop based on a "reasonable, articulable suspicion that criminal activity is afoot."  *Id*.  But using this test to evaluate an excessive force claim was improper and legally unsupported.  As Judge Rawlinson explained, "[t]he majority's continued reliance on *Terry* to justify a non-*Terry* encounter finds no support in excessive force precedent."  Op. 44 n.7 (Rawlinson, J., dissenting) (citing *Felarca*, 891 F.3d at 817; *Graham*, 490 U.S. at 396)).  Indeed, under *Graham* and *Felarca*, suspicion alone does not justify the use of force.  Op. 36 (Rawlinson, J., dissenting) (citing *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017)).  At most, it would justify a brief, investigatory stop pursuant to *Terry*, which did not occur here.  *Id.* (citing *Terry*, 392 U.S. at 15).

The panel majority's disregard of the *Graham* factors in a published opinion will have exceptional ramifications for excessive force analysis.  The *Graham* factors help courts ascertain whether there was an "immediate need to subdue" a suspect, and if so, how much force was reasonable to achieve that goal.  *See Bryan v. MacPherson,* 630 F.3d 805, 832 (9th Cir. 2010).  The majority's approach

radically shrinks the inquiry to a single consideration: if an officer merely "reasonably believ[es]" that a suspect is "planning" an unspecified crime, the officer may point his weapon, wrench the suspect from his vehicle, and place the suspect in imminent fear of physical harm, even when the officer has no objective or specific reason to believe the suspect poses an immediate threat. Op. 16. As Judge Rawlinson stated, this approach to excessive force analysis replaces the *Graham* factors with the more lenient *Terry* standard and allows an officer to "proceed[] directly to the use of force including the pointing of weapons." *See* Op. 43-44 (Rawlinson, J., dissenting). This undermines a critical constitutional safeguard and introduces confusion into this Court's Fourth Amendment jurisprudence.

By failing to apply the *Graham* factors in this case, the panel majority is also out of step with other circuits, which routinely hold that the *Graham* factors *must* be applied to determine whether "an officer exceed[ed] the bounds of reasonable force in effecting an arrest or investigatory stop." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (applying *Graham* factors to find that officer's use of force during traffic stop was unreasonable); *see, e.g.*, *Turmon v. Jordan*, 405 F.3d 202, 204-208 (4th Cir. 2004) (separately analyzing whether officer had reasonable suspicion to conduct an investigative detention under *Terry*, and whether the officer used reasonable force during the detention under *Graham*); *Rogoz v. City of*

*Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (explaining that the *Graham* factors "must be considered in determining whether the force used was necessary or was instead excessive").

With respect to Mr. Hopson's excessive force claim, the question whether the Court needed to analyze the *Graham* factors is not purely academic. The majority's failure to do so altered the outcome of this case because, even if the officers reasonably believed that Mr. Hopson was preparing to engage in an armed robbery (they did not[2]), each of the other *Graham* factors, when properly analyzed, supports the inescapable conclusion that the force used against Mr. Hopson was excessive. *See* Op. 42 (Rawlinson, J., dissenting).

First, as Judge Rawlinson concluded, with respect to the most important factor, the record does not indicate the existence of an immediate threat. Op. 40. Mr. Hopson was in a car conversing with Mr. Jones; nothing in the record supports an inference that the officers observed a weapon (or any item that could resemble a weapon), and Mr. Hopson was not aware of the officers' presence. *Id.* at 39-40. In addition, Alexander "had time to call for backup and wait for their arrival, a clear

---

[2] As is explained in Section II below, the majority could only find a reasonable suspicion of an armed robbery by drawing factual inferences not permitted on summary judgment, failing to construe disputed facts in the light most favorable to Mr. Hopson, and improperly requiring Mr. Hopson to contest each statement offered by the officers. *See infra* Section II.

indication that no urgency existed." *Id.* at 39. "[N]o split-second decisionmaking was required under the circumstances of this case," *id.*, because there was simply no "rapidly escalating situation." *See Ames v. King County*, 846 F.3d 340, 349 (9th Cir. 2017).

A lack of immediate threat posed by the suspect is the most important factor in the *Graham* analysis because the excessive force inquiry determines whether the force used was *reasonable*, and reasonableness turns on a balancing of the nature and quality of the use of force against the countervailing governmental interest at stake. *Felarca*, 891 F.3d at 817; *see also Graham*, 490 U.S. at 396. If a suspect does not pose an immediate threat, then the governmental interest in protecting others is at its lowest. Because the facts construed in the light most favorable to Mr. Hopson show that there was no immediate threat, "this 'most important' factor weighs in favor of a finding of excessive force." Op. 41 (Rawlinson, J., dissenting) (quoting *Felarca*, 891 F.3d at 817).

The other two factors similarly weigh in Mr. Hopson's favor. It is undisputed that Mr. Hopson did not "actively resist[] arrest or attempt[] to evade arrest by flight." Op. 41 (Rawlinson, J., dissenting). And finally, there were less intrusive alternatives available to the officers. For example, the officers could have given a warning or conducted an investigatory stop pursuant to *Terry* if they had reasonable suspicion that criminal activity was afoot, but lacked probable

cause to support a conclusion that a specific crime had been or was about to be committed.[3]  Op. 42 (Rawlinson, J., dissenting) (citing *Terry*, 392 U.S. at 20).  The officers also could have approached the vehicle with their hands in their holsters but not drawn the weapons.  This factor, therefore, also supports the conclusion that the officers used excessive force.  *Id.* (citing *Andrews v. City of Henderson*, 35 F.4th 710, 717-718 (9th Cir. 2022)).

Rehearing is warranted to clarify that this Court will continue to abide by the Supreme Court's reasoning in *Graham*, as in several decisions of this Court since then.  The Court should evaluate Mr. Hopson's excessive force claim by analyzing all of the *Graham* factors together.

## II. REHEARING IS NECESSARY TO CLARIFY THAT, AT SUMMARY JUDGMENT, A NON-MOVANT IS NOT REQUIRED TO CONTEST EVERY STATEMENT MADE BY THE MOVING PARTY

The majority also failed to apply the correct summary judgment standard, which could likewise have disastrous consequences for litigants.  At summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tolan*, 572 U.S. at 651.  In conducting the reasonableness inquiry, moreover, "all material disputes" must be resolved in favor of the non-movant, including where evidence supporting the non-movant's version

_____

[3] The officers did not argue that they had probable cause to detain or arrest Mr. Hopson, Op. 42 (Rawlinson, J., dissenting), and the state trial court found that the initial investigatory stop was unjustified, Op. 13.

of the facts is contained in "other papers in the record." *Martinez v. Stanford*, 323

F.3d 1178, 1184 (9th Cir. 2003). Importantly, allegations in a verified complaint

filed by a pro se litigant are admissible to oppose summary judgment.[4] *See Jones*

*v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[W]e must consider as evidence in

his opposition to summary judgment all of [plaintiffs'] contentions offered in

motions and pleadings, where such contentions are based on personal knowledge

and set forth facts that would be admissible in evidence, and where [plaintiff]

attested under penalty of perjury that the contents of the motions or pleadings are

true and correct.").

Notwithstanding these bedrock principles, the majority ignored

Mr. Hopson's version of events and improperly required Mr. Hopson to contest

explicitly each fact advanced by the officers. *See* Op. 39 n.3 (Rawlinson, J.,

dissenting) (citing *Martinez*, 323 F.3d at 1183). For instance, the majority stated

that Mr. "Hopson has not contested [the officers' statement] that he and Jones

exchanged items or that Jones went back to his vehicle to retrieve something." Op.

15; *see also id.* at 6 (noting that Alexander observed Mr. Jones and Mr. Hopson

"exchange items"). But as Judge Rawlinson explained, Mr. Hopson "ha[d] no

burden to 'contest' any version of the facts advanced by the officers." Op. 39-40

---

[4] Mr. Hopson filed his verified complaint while incarcerated and pro se. *See* ER-
67.

n.3 (Rawlinson, J., dissenting) (citing *Martinez*, 323 F.3d at 1183). Mr. Hopson's assertion in his verified complaint that he and Mr. Jones were engaged in a private conversation (not exchanging items or leaving and reentering the car) is sufficient to present a factual dispute on this point, which the Court may not resolve on an interlocutory appeal from a summary judgment order denying qualified immunity. Op. 34-35 n.1 (Rawlinson, J., dissenting) (citing *Cunningham v. City of Wenatchee*, 345 F.3d 802, 806-807 (9th Cir. 2003)). No additional specificity is required. *Martinez*, 323 F.3d at 1182.

The majority's requirement that Mr. Hopson—the non-movant at summary judgment—contest each fact proffered by the moving party contradicts this Court's precedent. Notably, the pleadings of pro se litigants in this Circuit are held to "less stringent standards than those prepared by attorneys." *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998). The majority's failure to consider how Mr. Hopson's version of events potentially contradicted Appellants' factual assertions would have been improper for a *represented* non-movant, and in this case it also defies the indulgence routinely granted to incarcerated pro se litigants in this Circuit. *See, e.g.*, *Blanas*, 393 F.3d at 923 (holding the court "must consider as evidence in [incarcerated pro se plaintiff's] opposition to summary judgment all of [plaintiff's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence …");

*Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (holding incarcerated pro se litigant's "verified complaint may be used as an opposing affidavit under Rule 56"); *Rainwater v. Alarcon*, 268 F. App'x 531, 534 (9th Cir. 2008) (holding incarcerated pro se litigant sufficiently contested facts alleged in defendants' summary judgment motion via his verified complaint and other pleadings, notwithstanding his failure to file a "Statement of Genuine Issues" as required by the local rules). This contravenes the Ninth Circuit's long-held principle that "courts should construe liberally motion papers and pleadings filed by *pro se* inmates and *should avoid applying summary judgment rules strictly*." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (emphasis added).

Moreover, the majority's requirement that Mr. Hopson specifically contest each of Appellants' factual assertions conflicts with the rule clearly espoused in other circuits that "a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (holding plaintiff's verified complaint was sufficient to contest facts in defendants' summary judgment motion, notwithstanding plaintiff's failure to respond to the motion).

Here, again, the majority's misplaced analysis was consequential. When viewed in the light most favorable to Mr. Hopson, the record indicates that the

officers did not suspect—reasonably or not—that Mr. Hopson was engaged in an armed robbery, let alone any other violent crime.  *See* Op. 41 (Rawlinson, J., dissenting).  Mr. Hopson was merely sitting inside his car conversing with Mr. Jones when the officers approached.  Moreover, Alexander declared that, at the time he inflicted force, he only suspected Mr. Hopson and Mr. Jones of being engaged in unspecified "criminal activity."  ER-52.  Only by failing to construe all factual disputes in Mr. Hopson's favor could the majority make the leap that Alexander suspected Mr. Hopson of engaging in an armed robbery.  As Judge Rawlinson stated, it was "equally 'clear' that Detective Alexander suspected a crime involving marijuana," and "the record confirms that the crime suspected by Detective Alexander after Mr. Hopson's arrival was indeed unspecified.  Otherwise, there would be no need to resort to context and inference."[5]  Op. 37-38 (Rawlinson, J., dissenting).

Review by the full Court is warranted to clarify that courts may not require non-movants—particularly pro se non-movants—at summary judgment to contest

---

[5] The majority's error is further exhibited in its statement that because Alexander did not declare that "he no longer believed an armed robbery was in the works," he must have believed that an armed robbery was imminent.  Op. 16.  As Judge Rawlinson explained, this does not take the facts in the light most favorable to Mr. Hopson.  Op. 38 (Rawlinson, J., dissenting).  Just as Alexander did not indicate that he no longer believed an armed robbery was afoot, he also did not indicate that he still believed an armed robbery was afoot.

every statement made by the moving party.  It suffices that the non-movant's version of events differs from the movant's recollection; in that situation, summary judgment is improper and the matter should be set for trial.

## III. REHEARING IS NECESSARY TO RESOLVE A CONFLICT BETWEEN THE PANEL MAJORITY'S DECISION AND THIS COURT'S PRECEDENT REGARDING THE USE OF FORCE DURING *TERRY* STOPS

The panel majority's opinion contradicts this Circuit's well-established rule that *Terry* alone does not authorize an officer to point a weapon at a suspect, use handcuffs, or otherwise employ the type of force inflicted by Appellants.  Op. 43 (Rawlinson, J., dissenting).  "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Washington*, 98 F.3d at 1187.  This Court has "consistently applied the principle that drawing weapons and using handcuffs or other restraints is *unreasonable* in many situations involving investigatory or *Terry* stops."  *Green*, 751 F.3d at 1050 (emphasis added); *see also Washington,* 98 F.3d at 1187 (holding, in the qualified immunity context, that "the law was *clearly established* that, when making a *Terry* stop, officers may not use highly intrusive measures such as drawing weapons and handcuffing], unless the circumstances reasonably justify such extraordinary procedures in order to ensure the officers' safety") (emphasis added).

This case is so analogous to *Washington* and *Green* that rehearing is necessary to preserve uniformity in this Court's decisions. In *Washington*, this Court denied qualified immunity to an officer who pointed his gun at and handcuffed two men suspected of armed robbery during a *Terry* stop when there were no "special circumstances" justifying the use of those "especially intrusive means of effecting a stop." *See* 98 F.3d at 1189-90. No special circumstances were present in Mr. Hopson's case either: (1) Mr. Hopson was not resisting arrest or attempting to flee, *see* ER-10-11; (2) Appellants did not believe, reasonably or otherwise, that Mr. Hopson was armed, ER-19; (3) there had not been a violent crime in the vicinity shortly before the stop; and (4) Appellants did not have "specific information" to believe that Mr. Hopson was about to commit a dangerous crime. *See Washington*, 98 F.3d at 1189-1190 & n.15. Similarly, in *Green*, this Court held that pointing a gun at and forcibly detaining a suspect during a *Terry* stop—even if officers believed the suspect committed a "severe" crime—was not permissible when "there was no indication at the scene that [the suspect] posed an immediate threat to the safety of the officers or others." *Green*, 751 F.3d at 1050. In so holding, the Court explicitly applied *Washington*'s reasoning:

> The law was [] clearly established that if the *Terry*-stop suspects are
> cooperative and the officers do not have specific information that they
> are armed or specific information linking them to a recent or inchoate
> dangerous crime, the use of such aggressive and highly intrusive

tactics is not warranted, at least when, as here, there are no other extraordinary circumstances involved.

*Id.* at 1052 (quoting *Washington*, 98 F.3d at 1192).

The panel majority's grant of qualified immunity to Appellants under circumstances that so closely resemble *Washington* and *Green* clearly conflicts with this Court's precedent. Rehearing is necessary to resolve this conflict and to clarify that reasonable suspicion alone is not sufficient to enable an officer to point a gun at a suspect and forcibly detain him.

## CONCLUSION

The petition for panel rehearing and rehearing en banc should be granted.

Respectfully submitted,

/s/ Mary V. Sooter

OREN NIMNI
RIGHTS BEHIND BARS
416 Florida Avenue, NW, Unit #26152
Washington, DC 20001
(202) 540-0029

MARY V. SOOTER
MARGARITA BOTERO
JAKE C. BROWNELL
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1225 Seventh Street, Suite 2600
Denver, CO 80202
(720) 274-3133

*Attorneys for Plaintiff-Appellee*
*Dejuan Markeiss Hopson*

July 31, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** | 21-16706

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 4,196 |.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Mary V. Sooter        **Date** | July 31, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**                                                      *Rev. 12/01/2021*

# ADDENDUM

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEJUAN MARKEISS HOPSON, | No. 21-16706 |
| *Plaintiff-Appellee,* | D.C. No. 2:20-cv-00128-SMB-DMF |
| v. | |
| JACOB ALEXANDER; BRANDON GRISSOM, | OPINION |
| *Defendants-Appellants,* | |

Appeal from the United States District Court
for the District of Arizona
Susan M. Brnovich, District Judge, Presiding

Argued and Submitted August 10, 2022
San Francisco, California

Filed June 16, 2023

Before: Johnnie B. Rawlinson, Bridget S. Bade, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Rawlinson

# SUMMARY[*]

## Civil Rights / Qualified Immunity

The panel reversed the district court's denial of qualified immunity to police detectives Jacob Alexander and Brandon Grissom in an action brought pursuant to 42 U.S.C. § 1983 alleging defendants used excessive force when they pointed a gun at plaintiff and forcefully extracted him from a car, without identifying themselves as law enforcement officers.

Believing that two men were about to engage in the armed robbery of a gas station, defendants approached the suspects' vehicle with guns pointed, forcibly removed the driver, plaintiff DeJuan Hopson, and handcuffed him.

In holding that the officers were entitled to qualified immunity, the panel first determined that it was not clearly established that the officers lacked an objectively reasonable belief that criminal activity was about to occur. Under the qualified immunity framework and given the suspicious *Terry*-like conduct observed here, no clearly established law gave the panel cause to second-guess Detective Alexander's on-the-ground suspicion that an armed robbery was about to occur. And an armed robbery necessarily involves the use of weapons. Clearly established law therefore did not prevent the officers from suspecting plaintiff might be armed—which, in fact, he was.

The panel held that defendants did not violate clearly established law when they pointed their guns at plaintiff.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Noting that this Circuit's law makes clear that pointing a gun at a suspect is not categorically out of bounds, the panel could find no authority that placed the unconstitutionality of the detectives' conduct beyond debate in the circumstances they confronted.

The panel next rejected plaintiff's contention that defendants violated clearly established law by using excessive force when removing him from the car and arresting him. No clearly established law prevented the detectives from acting quickly and with moderate force to ensure that plaintiff was detained without incident. Thus, no controlling authority clearly established beyond debate that the amount of force used during plaintiff's arrest was objectively unreasonable.

Finally, the panel rejected plaintiff's argument that the detectives violated clearly established law in failing to identify themselves as law enforcement officers. Under the circumstances of this case, precedent did not clearly establish that the detectives' alleged failure to identify themselves as police officers made their use of force excessive.

Dissenting, Judge Rawlinson stated that under the facts of this case, viewed in the light most favorable to plaintiff, the officers violated clearly established law when they forcefully yanked plaintiff from his vehicle at gunpoint without warning and forcefully handcuffed him, when he was merely conversing with a passenger in the vehicle and posed no immediate threat to the officers or to the public. Because the officers who used this gratuitous and violent excessive force against plaintiff were not entitled to qualified immunity, Judge Rawlinson would affirm the district court's judgment.

**COUNSEL**

Alexander J. Lindvall (argued), Deputy City Attorney, City of Mesa Attorney's Office, Mesa, Arizona, for Defendants-Appellants.

Margarita Botero (argued) and Mary V. Sooter, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, Colorado; Sophie B. Cooper, Wilmer Cutler Pickering Hale and Dorr LLP, San Francisco, California; Thomas Lampert, WilmerHale, Boston, Massachusetts; Oren Nimni, Rights Behind Bars, Washington, D.C.; for Plaintiff-Appellee.

# OPINION

BRESS, Circuit Judge:

Believing that two men were about to engage in the armed robbery of a gas station, Detectives Jason Alexander and Brandon Grissom approached the suspects' vehicle with guns pointed, forcibly removed the driver, and handcuffed him. The officers found a firearm in the vehicle. The driver of the car had a felony conviction and could not legally possess the gun. We consider here not the lawfulness of the driver's conduct (at least not directly), but that of the officers. In this case, the driver, DeJuan Hopson, has sued the detectives under 42 U.S.C. § 1983, alleging that they used excessive force when pointing a gun at him and forcefully extracting him from the car, all without identifying themselves as law enforcement officers.

We hold that the officers are entitled to qualified immunity. All we decide is whether the officers violated clearly established constitutional law in the circumstances they confronted. They did not. We reverse the district court's denial of qualified immunity and remand for proceedings consistent with this opinion.

## I

On January 25, 2018, Detective Jacob Alexander pulled his unmarked police vehicle into a Gilbert, Arizona gas station to purchase a drink. He watched as another driver, later identified as Tommy Jones, backed into a parking spot, "cran[ed] his neck," and "nervously" looked around. Jones repeated this behavior several times, each time backing into a new parking spot and "turn[ing] his body 180 degrees in the vehicle to get a good look at his surroundings."

Jones remained in his vehicle throughout, leading Alexander to conclude that Jones "had no intention of making a purchase at the gas station." It appeared to Alexander that Jones was scouting around for police officers, video cameras, or other means by which he could be detected, and that Jones was trying to find a parking spot that would allow a hasty exit. Based on Jones's "abnormally nervous" behavior and Alexander's training and decade-plus of law enforcement experience, Alexander believed Jones was "casing" the gas station and that "an armed robbery was about to occur."

After watching this activity go on for approximately fifteen minutes, Alexander observed plaintiff DeJuan Hopson drive into the parking lot and park alongside Jones. Jones then exited his own vehicle and got into Hopson's. Alexander watched them converse and exchange items. At one point, Jones retrieved something from his own car and returned to Hopson's vehicle. Believing that Jones and Hopson were about to embark on criminal activity and knowing that traffic stops can be dangerous, Alexander called for backup. Detective Brandon Grissom arrived a few minutes later, apparently accompanied by four other officers. Grissom parked his police car (which we assume was also unmarked) behind Hopson's vehicle.

Although what happened next is disputed, we recite Hopson's version of the story. Detective Alexander approached Hopson's driver's side door with his gun pointed out. Alexander opened the door and "forcefully removed" Hopson from the vehicle. In doing so, he yanked Hopson's left arm with "enough force to put [him] in a state of shock and make [him] think that [he] was being robbed," and then "forcefully" handcuffed him while "verbally dar[ing]" Hopson to make a move. Alexander never announced that

he was a police officer. Detective Grissom stood nearby throughout the encounter and kept his gun pointed at Hopson. Another officer pulled Jones out of the passenger side of the vehicle, and three more officers also stood by, all with guns drawn. Although Hopson alleges no physical injury, he claims that Alexander and Grissom's actions caused him to experience "depression, anxiety, loss of sleep, nervous[ness], and a fear of retaliation."

The detectives questioned Hopson about the smell of marijuana emanating from the car and checked Hopson's driver's license status and criminal history. This turned up Hopson's prior felony convictions for aggravated assault and several weapons-related offenses, that he was on probation for another crime, and that his license was suspended. Both because he was a convicted felon and because he was on probation, Hopson was not permitted to possess a firearm. Based on the marijuana odor coming from the car and Hopson's inability to demonstrate he could use marijuana for medical purposes (as well as the fact of Hopson driving with a suspended license), the detectives undertook a search of the car. They first found marijuana but then discovered a Glock handgun with an extended magazine between the driver's seat and the center console.

Alexander placed Hopson under arrest. Hopson was later charged in Maricopa County Superior Court with possession of marijuana and unlawful possession of a firearm. Hopson filed a motion to suppress the evidence found in his car, arguing that there was insufficient justification for an investigatory stop. Finding that there was not reasonable suspicion to support the stop, the state trial court granted Hopson's motion and dismissed all charges without prejudice.

On April 23, 2020, Hopson filed a pro se complaint against Alexander and Grissom (Hopson now has counsel on appeal).[1] Hopson brought claims under § 1983, alleging that the detectives violated the Fourth and Fourteenth Amendments when they (1) stopped him without reasonable suspicion and (2) used excessive force when arresting him.

The detectives moved for summary judgment, and Hopson did not respond to their motion. The district court compared the facts of this case to *Terry v. Ohio*, 392 U.S. 1 (1968), which it viewed as "very similar." Finding that "a reasonable officer easily could have believed that he had reasonable suspicion to stop" Hopson and Jones, the court granted summary judgment to the detectives on Hopson's unlawful stop claim. On the excessive force claim, however, the district court found that it could not resolve "the key factual dispute in this case—whether Defendants used *any* force at all against Plaintiff, let alone unreasonable force." The district court therefore denied the detectives' motion for summary judgment on the excessive force claim.

Alexander and Grissom timely appeal.

## II

Although we generally do not have jurisdiction to review denials of summary judgment, which are interlocutory in nature, a summary judgment order denying qualified immunity is immediately appealable. *Wilkinson v. Torres*, 610 F.3d 546, 549–50 (9th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007)). In such an appeal, we decide de novo whether the facts, "considered in the light most

---

[1] The district court separately dismissed Hopson's claims against the other four officers. Those other officers are not part of this appeal.

favorable to the plaintiff," show that qualified immunity is warranted. *Ames v. King County*, 846 F.3d 340, 347 (9th Cir. 2017). Although we "assum[e] that the version of the material facts asserted by the [plaintiff] is correct," *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001), we may consider facts offered by the defendant that are "uncontradicted by any evidence in the record," *Wilkinson*, 610 F.3d at 551.

Here, we do not resolve any factual disputes, nor does the factual dispute that the district court identified— concerning the degree of force the detectives used— detain us. We assume that Hopson's version of the facts, which we recited above, is the correct one. And we analyze the qualified immunity question under that set of facts. *See Ames*, 846 F.3d at 347.

## A

Under the doctrine of qualified immunity, police officers are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). This familiar conjunctive test allows us to approach the qualified immunity question using either prong as our starting point. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We may thus "exercise our discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

Under the second prong of the inquiry, a constitutional violation is clearly established only if existing law "placed the constitutionality of the officer's conduct 'beyond debate,'" such that "every 'reasonable official would

understand that what he is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Although "a case directly on point" is not necessarily required, a rule is only clearly established if it has been "settled" by "controlling authority" or "a robust consensus of cases of persuasive authority" that "clearly prohibit[s] the officer's conduct in the particular circumstances," with "a high degree of specificity." *Id.* at 589–90 (quotations omitted). Importantly, we may not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

These guideposts, which the Supreme Court has insistently fixed in many cases, have special relevance in the Fourth Amendment context. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). Fourth Amendment violations generally, and excessive force claims more specifically, can involve situations "in which the result[s] depend[] very much on the facts of each case." *Plumhoff*, 572 U.S. at 779 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam)). The often fact-dependent nature of judicial decision-making in this area can make it difficult for officers to know in advance whether their actions will be found unlawful. *See Mullenix*, 577 U.S. at 12. Plaintiffs asserting excessive force claims must thus point to an existing rule that "squarely governs" the facts at issue and that moves the officer's actions outside the "hazy border between excessive and acceptable force." *Brosseau*, 543 U.S. at 201 (quotation

omitted); *see also Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (burden is on the plaintiff to identify precedent "that put [the defendant] on notice that his specific conduct was unlawful").

To determine whether an officer used excessive force in violation of the Fourth Amendment, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This requires us to take into account the totality of the circumstances, including the "type and amount of force inflicted," "the severity of injuries," "the severity of the crime at issue," "whether the suspect poses an immediate threat to the safety of the officers or others," and "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 817 (quotations omitted). We may also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Id.* Whether the suspect poses a threat is "the most important single element." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quotation omitted). We do not, however, consider these factors with clinical detachment. We must evaluate them appreciating that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

B

In this case, the general legal standards we have just set forth do not on their own provide a basis for denying the

detectives qualified immunity on Hopson's excessive force claim. The starting point for this analysis is determining whether, under the existing case law, the officers could have reasonably suspected that Hopson was engaged in criminal activity and that he was armed and dangerous. We will then proceed to determine whether it was clearly established that the amount of force the officers used was excessive in light of the perceived safety risk.

To begin, it was not clearly established that the officers lacked an objectively reasonable belief that criminal activity was about to occur. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."). Indeed, as the district court noted, the events at issue here bear notable resemblance to those in the Supreme Court's seminal *Terry* decision.

There, an officer watched two men repeatedly pace in front of a store window, peer around, and confer amongst themselves for several minutes. 392 U.S. at 6. A third man approached and briefly conversed with the other two before walking away. *Id.* Shortly after, the two men also walked off in the same direction. *Id.* The officer's training and experience led him to believe that the three men were casing the store for a robbery, and he stopped and frisked all three of them. *Id.* at 6, 28. The Supreme Court held that the officer had reasonable suspicion that the men were armed and dangerous, permitting the officer to frisk them for weapons. *Id.* at 28. The suspects' actions "were consistent with [the officer's] hypothesis that these men were contemplating a daylight robbery—which, it is reasonable to assume, would be likely to involve the use of weapons." *Id.*

In light of *Terry*, it is at the very least not clearly established that a reasonable officer was required to conclude that Jones and Hopson were *not* contemplating criminal activity. True, the state trial court dismissed the criminal charges against Hopson after finding that the initial investigatory stop was unjustified. But we are now dealing with a civil suit under § 1983, in which the doctrine of qualified immunity comes into play. Hopson in this case initially challenged the lawfulness of the detectives' investigatory stop, but the district court granted qualified immunity to the detectives on that claim. As the district court properly concluded, "[b]ecause the facts of this case are so similar to *Terry*, a reasonable officer easily could have believed that he had reasonable suspicion to stop the Plaintiff and his associate."

*Terry* confirms that the detectives' suspicion of a planned armed robbery was not unreasonable. *Terry* was not an excessive force case, and the police officer there did not point a gun. We do not suggest that *Terry* answers the excessive force question. But *Terry* shows, at the outset of our analysis, the type of "casing" conduct that an officer may reasonably view as suggestive of an armed robbery. *Terry* furthermore tells us that when officers suspect a person of "casing" a store for an armed robbery, they may reasonably believe that person to be armed and dangerous.

Under the qualified immunity framework, and given the suspicious *Terry*-like conduct observed here, no clearly established law gives us cause to second-guess Detective Alexander's on-the-ground suspicion that an armed robbery was about to occur. And an armed robbery necessarily involves the use of weapons. *See Terry*, 392 U.S. at 28. Clearly established law therefore did not prevent the officers

from suspecting Hopson might be armed—which, in fact, he was.

Our fine dissenting colleague sees things differently. But in our respectful view, the dissent rests on a misapprehension of the record. The dissent repeatedly intones that there was "no indication" of a threatened crime involving the use of force, and that Hopson thus posed "no threat to the safety of the officers or to the safety of the public." Dissent 41, 45. But the dissent is grounded on its determination that Hopson and Jones "were merely conversing in a vehicle." Dissent 43. As the dissent describes the situation, officers pointed guns at Hopson and yanked him from a vehicle "when he was merely conversing with Jones and posed no immediate threat to the officers or to the public." Dissent 50.

Although we are obligated to construe the facts in favor of the plaintiff at summary judgment, the record does not support the dissent's portrayal of the key events. This is not a case of officers pouncing on mere conversationalists. The dissent asserts that the officers "never conducted any investigation" before removing Hopson from the vehicle. Dissent 49. But Detective Alexander had in fact studied Jones for fifteen minutes as Jones suspiciously reparked his vehicle, craned his neck, scanned the parking lot, and nervously looked around—conduct that Detective Alexander perceived, based on his training and experience, as pre-planning for an armed robbery. When Hopson arrived and Jones entered Hopson's car, Detective Alexander watched the two exchange items, with Jones then going back to his car to get something and returning to Hopson's vehicle.

The dissent claims the latter points are disputed because Hopson alleged in his complaint that the incident took place "during a private conversation" between Hopson and Jones. The dissent takes this allegation to mean that the two men "were only engaged in conversation." Dissent 34 n.1. But Hopson has not contested that he and Jones exchanged items or that Jones went back to his vehicle to retrieve something. Hopson's complaint does not create a conflict on these points, nor did Hopson attest that he and Jones were "only" conversing—the dissent has added the "only." In fact, at oral argument, Hopson's counsel twice affirmatively noted Alexander's recollection that Hopson and Jones exchanged items, without suggesting there was any dispute of fact on this point.

Equally unfounded is the dissent's suggestion that Detective Alexander's suspicions somehow waned as the events wore on. Detective Alexander's declaration states that "Jones's actions led me to suspect that an armed robbery was about to occur," and that after Hopson arrived and the two exchanged items, "it was clear to me that Jones and Hopson were engaged in criminal activity." Seizing on the latter portion of Alexander's declaration, the dissent states that "once Mr. Hopson arrived on the scene," Detective Alexander's "suspicion morphed from a potential armed robbery to the more generic 'engag[ing] in criminal activity.'" Dissent 35. The dissent goes so far as to assert that "by the time Mr. Hopson arrived on the scene," Detective Alexander's "belief" "had shifted to the observation that the two individuals 'were engaged in [some unspecified] criminal activity.'" Dissent 47. But the dissent has added the words in brackets to the quote of Detective Alexander's declaration. In context, it is clear that the "criminal activity" to which Detective Alexander was

referring was the only criminal activity he had previously mentioned in his declaration: the planning of an armed robbery.[2]    Nothing in Detective Alexander's declaration indicates that he no longer believed an armed robbery was in the works or that his suspicions had abated.   The dissent's determination that there was no threat to the public does not rest on a permissible view of the facts.[3]

To the extent the dissent disagrees with how Detective Alexander perceived the situation, its position fares no better.  In performing the qualified immunity analysis, we do not "second-guess officers' real-time decisions from the standpoint of perfect hindsight." *O'Doan*, 991 F.3d at 1036. Nor has the dissent provided a basis to deem unreasonable the inferences Detective Alexander drew, based on his training and experience.    When evaluating officers' reasonable suspicions, "the facts must be filtered through the lens of the agents' training and experience." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en banc).  Especially in light of *Terry*, no clearly established law prevented Detective Alexander from reasonably believing that based on the suspicious conduct he observed, Hopson and Jones were planning an armed robbery of the gas station.

---

[2] The dissent suggests that Detective Alexander's reference to "criminal activity" could have merely been to suspected marijuana use, Dissent 37, but Detective Alexander did not notice the odor of marijuana until he confronted Hopson.

[3] Contrary to suggestions in the dissent, the issue here is simply whether the degree of force used in connection with the stop was excessive (and violated clearly established law).  This case does not involve a claim of wrongful arrest for lack of probable cause.

C

The question then becomes whether it was clearly established that the degree of force the detectives used in response to the perceived threat was excessive under the Fourth Amendment. The general standards for excessive force tell us that the proper uses of force can include the very types of force used here: pointing a gun at a suspect and handcuffing him. *See Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) (emphasis added). Indeed, we have expressly held that "[i]t is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, *such as stopping them at gunpoint and handcuffing them*, are reasonable." *Id.* (emphasis added). The detectives thus argue that when officers not unreasonably perceive the type of dangerous threat suspected here, under *Graham* it is permissible to point a gun at a suspect to secure the situation and ensure the safety of those in the area, including that of the officers themselves.

For our purposes, however, it is sufficient that the general standards set forth in *Graham* and its progeny do not clearly establish that the detectives' use of force was *un*lawful. The Supreme Court has been very clear: given the often fact-bound features of excessive force claims, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13); *see also, e.g.*, *Brosseau*, 543 U.S. at 201; *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020). The *Graham* standards for the most part supply general rules of conduct; they are not typically a prescription for what may be permissible in a specific case.

The Supreme Court has thus clarified that the *Graham* excessive force test does not "create clearly established law outside an 'obvious case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Brosseau*, 543 U.S. at 199).

There is no dispute here that what Detective Alexander observed was sufficient to arouse suspicion. Even Hopson's counsel agreed at oral argument that "nobody is saying that the officers could not have intervened." The dissent, too, agrees that some amount of intervention was warranted. But when it comes to what that intervention could look like, as a matter of clearly established law *Graham* did not, standing alone, confine Detective Alexander to a menu of options less forceful than the actions he took (which ultimately resulted in no claimed physical injury to Hopson). Nor does *Graham* clearly establish that Detective Alexander was prevented from using the element of surprise, which has obvious tactical advantages.

In brief, when Detective Alexander was observing conduct that, in his training and experience, was indicative of a potential imminent armed robbery, *see Terry*, 392 U.S. at 28, the general legal standards we recited above did not make what Alexander chose to do next "beyond debate" under the Fourth Amendment. *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741). Qualified immunity may of course be denied if the constitutional violation was "obvious." *See id.* at 590 (quoting *Brosseau*, 543 U.S. at 199). But there is no suggestion this is such a case. *See id.* (noting that instances in which a violation of constitutional

law are "obvious" without more specific case law are "rare").[4]

To overcome the detectives' qualified immunity, then, Hopson needs more specific case law that demonstrates the unlawfulness of the detectives' conduct under the "particular circumstances" they confronted. *Wesby*, 138 S. Ct. at 589–90 (quotations omitted). Hopson maintains that he has such precedent. It is to a consideration of that case law that we now turn.

## III

Hopson focuses on three aspects of the detectives' conduct that, in his view, were clearly prohibited under existing precedent: (1) pointing a weapon at him; (2) "forcefully" removing him from his vehicle and handcuffing him; and (3) failing to announce that they were police officers. But the cases Hopson cites are materially different from this one. Hopson thus identifies no clearly established law that would cause "every reasonable official" to understand that any of these actions violate the Fourth

---

[4] Hopson claims that the detectives did not actually believe he posed a threat, relying primarily on the district court's statement that the detectives "have not pointed to any evidence in the record that demonstrates that they believed, reasonably or otherwise, that Plaintiff had a weapon or that he otherwise posed a threat to the safety of others *when Defendant Alexander approached Plaintiff's vehicle.*" But the record contains an uncontradicted declaration from Detective Alexander explaining that he did have such a belief. And as we noted, the district court itself analogized this case to *Terry*, in which a detective reasonably believed that individuals were casing a store in preparation for an armed robbery. Regardless, the reasonableness of the detectives' actions is a "pure question of law" on which we do not give deference to the district court. *Scott*, 550 U.S. at 381 n.8.

Amendment in the circumstances of this case. *Wesby*, 138 S. Ct. at 590.

A

Hopson first claims that case law clearly establishes that the detectives violated the Fourth Amendment when they pointed their weapons at him. Hopson primarily relies on three cases: *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996), *Espinosa v. City of San Francisco*, 598 F.3d 528 (9th Cir. 2010), and *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc). None of these cases, however, is factually analogous enough to clearly establish that the detectives' specific conduct was unlawful.

We begin with *Washington*. In that case, police stopped two Black men at gunpoint on the asserted belief that they were suspects in a string of armed robberies. *Washington*, 98 F.3d at 1183. None of the robberies had taken place in the area in which the suspects were located, and the most recent robbery had occurred almost a week earlier. *Id.* Neither suspect fit the physical descriptions of the wanted men, nor were they driving the type of vehicle that the robbers had reportedly used. *Id.* at 1183–84. Officers nonetheless followed the men from a fast-food restaurant to a hotel, and, with a force seven officers strong, pointed their guns at the men and handcuffed them. *Id.* at 1184. Police released the men only once they realized these were not the suspects for whom they were looking. *Id.* The men, a magazine editor and a banking analyst, turned out to be visitors to the Los Angeles area who were in town for a Dodgers game. *Id.* at 1183.

Hopson argues that *Washington* put the detectives on notice that it would be unlawful to exercise force without first finding, based on specific information, that Hopson was

resisting arrest or attempting to flee, that he was armed and dangerous, that a violent crime had recently been committed in the area, or that Hopson was about to commit a dangerous crime. But *Washington* does not impose such a rigid calculus, nor does it speak so clearly to the facts at hand.

*Washington* addressed a different question: the proper framework for determining whether a police interaction qualifies as a *Terry* stop or an arrest. *Id.* at 1185–92. We held in *Washington* that the officers had effected an arrest and that they lack probable cause to do so. *Id.* at 1192. We did not decide whether the officers' actions constituted excessive force. And even then, and of more relevance here, we did not create inflexible rules demarcating a stop from an arrest. Instead, we explained that "whether the police action constitutes a *Terry* stop or an arrest" is assessed "by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*." *Id.* at 1185 (emphasis in original); *see also id.* ("The relevant inquiry is always one of reasonableness under the circumstances." (quotation omitted)).

Hopson notes that in *Washington*, we stated that "all people have a right to be free from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists," and that "police may not employ such tactics *every time* they have an 'articulable basis' for thinking that someone may be a suspect in a crime." *Id.* at 1187. But this statement begs the question of when such police conduct—including pointing a gun—may be permissible. We have recognized that "the pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury." *Tekle v. United States*, 511 F.3d

839, 845 (9th Cir. 2007). But *Washington* presumed what our case law elsewhere makes clear: that gun-pointing is permitted "when an officer reasonably believes force is necessary to protect his own safety or the safety of the public." *Alexander*, 64 F.3d at 1320.

In *Washington*, the two men who were arrested "did nothing immediately prior to or during their confrontation with the police" to justify the officers' conduct, and the police, who were operating on an effectively baseless belief that the men were suspects in a nearly week-old robbery, had "no reason to believe that [the men] were about to commit any crime." 98 F.3d at 1190; *see also id.* at 1194 (Kozinski, J., concurring in the judgment) (describing the facts of *Washington* as "egregious"). Even if *Washington* were transferable to the excessive force context, the facts at issue in that case were considerably different than what we have here, where Detective Alexander observed suspicious conduct that led him to believe there was a threat of an armed robbery. *Washington* therefore does not qualify as clearly established law for purposes of the qualified immunity inquiry in this case.

Hopson next points to our decision in *Espinosa*. *See* 598 F.3d at 537–39. In that case, officers entered a residence after receiving a tip that it could be a drug house. *Id.* at 532. Upon entry, the officers found a bloody shirt and one resident with a knife. *Id.* at 532–33. Two officers then went into the attic with their guns drawn, where they found another individual, Asa Sullivan. *Id.* at 533. The officers told Sullivan to put up his hands. *Id.* When he failed to do so, they shot and killed him. *Id.* Sullivan was unarmed, although both officers claimed they thought he was holding something. *Id.*

We held that summary judgment was inappropriate on the question of whether the gun-pointing constituted excessive force. *Id.* at 537–38. We reasoned that "pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Id.* at 537. That level of force may not have been justified because Sullivan "had not been accused of any crime," he "did not present a danger to the public," he "could not escape from the attic," and there was overall a "low level of threat." *Id.* at 537–38. Sullivan was also not the reason the officers had forcibly entered the residence in the first place. *Id.* at 537.

The facts of *Espinosa* are too different to clearly establish that the detectives acted outside the law in pointing guns at Hopson. Hopson attempts to analogize his situation by arguing that like Sullivan, he had yet to commit a crime. But *Espinosa* did not purport to create a bright-line rule that officers can only exercise force after they find a weapon or witness a crime already in progress—a rule of law that would pose obvious problems for public safety. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). Because the facts of *Espinosa* are sufficiently distinguishable from this case, *Espinosa* cannot "squarely govern[]" here for qualified immunity purposes. *See Brosseau*, 543 U.S. at 201.

*Robinson*, too, is materially distinct. The officers in that case were investigating a mere misdemeanor that had occurred earlier in the day. 278 F.3d at 1010, 1014. At the time the officers pointed their weapons at the 64-year-old suspect, he had already peacefully approached them, introduced himself, and begun cooperating. *Id.* at 1010. Here, by contrast, Detective Alexander believed Hopson's

associate was casing the convenience store and saw him acting nervously and abnormally. These observations not unreasonably led Alexander to suspect an armed robbery was about to take place. *See Terry*, 392 U.S. at 28.

Given these factual distinctions, *Robinson* does not "squarely govern" this case. *Cf. Thompson v. Rahr*, 885 F.3d 582, 588 (9th Cir. 2018) (granting qualified immunity in gun-pointing case and distinguishing *Robinson* on the ground that it did not "feature facts sufficiently similar to the pattern we address here to put the constitutional question *beyond debate* as required to defeat qualified immunity"). Notably, *Robinson* itself granted qualified immunity to the officers because the constitutional right that had been violated was not clearly established at the time. 278 F.3d at 1015–16.

Hopson cites other "gun pointing" cases finding excessive force, but they, too, involve materially different circumstances. *E.g.*, *Tekle*, 511 F.3d at 845–46 (suspect was an unarmed, "barefoot, eleven-year-old" child outside his home who cooperated with the police); *Hopkins v. Bonvicino*, 573 F.3d 752, 776–77 (9th Cir. 2009) (officer was investigating a misdemeanor and knew the suspect "was not a threat to officer safety"); *Thompson*, 885 F.3d at 584, 587 (suspect had already been searched for weapons and was under the officer's control, but qualified immunity was held to apply nonetheless).

Our case law makes clear that pointing a gun at a suspect is not categorically out of bounds. *See Alexander*, 64 F.3d at 1320. Other courts are in accord. *See, e.g.*, *Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008) ("[I]f you are a police officer with reason to believe there may be an armed robber in a van you approach with utmost caution,

which may include pointing a gun at the occupants.");
*Courson v. McMillian*, 939 F.2d 1479, 1496 (11th Cir. 1991)
("[I]t is not unusual for a law enforcement officer to have his
weapon drawn[] when approaching individuals suspected of
drug involvement.").  Indeed, in *Alexander* itself, we held
that officers did not violate clearly established law in
pointing guns at robbery suspects in the course of detaining
them, even though it turned out to be a case of mistaken
identity.  64 F.3d at 1318, 1320.[5]

Because we can find no authority that places the
unconstitutionality of the detectives' conduct "beyond
debate" in the circumstances they confronted, we hold that
the detectives did not violate clearly established law when
they pointed their guns at Hopson.  *See Wesby*, 138 S. Ct. at
589.

## B

Hopson next argues that the detectives violated clearly
established law by using excessive force when removing him
from the car and arresting him.  Specifically, Hopson alleges
that Alexander "forcefully removed" him from his vehicle,
yanked his left arm with "enough force to put [him] in a state

---

[5] The dissent notes that in *Alexander*, we did deny summary judgment
on one of the plaintiffs' claims.  Dissent 48.  But that part of our decision
considered whether it was reasonable for police to refuse to loosen the
handcuffs on a dialysis patient until his hands swelled up and turned blue,
causing injuries that persisted nine months later.  64 F.3d at 1323.  That
portion of our decision is not germane to this case.  What is relevant here
is *Alexander*'s holding that "[i]t is well settled that when an officer
reasonably believes force is necessary to protect his own safety or the
safety of the public, measures used to restrain individuals, such as
stopping them at gunpoint and handcuffing them, are reasonable." *Id.* at
1320.

of shock and make [him] think that [he] was being robbed,"
and "forcefully" handcuffed him. We hold that once again,
the detectives are entitled to qualified immunity.

As the Supreme Court has long recognized, "the right to
make an arrest or investigatory stop necessarily carries with
it the right to use some degree of physical coercion."
*Graham*, 490 U.S. at 396. "Not every push or shove, even if
it may later seem unnecessary in the peace of a judge's
chambers, violates the Fourth Amendment." *Id.* at 396
(internal quotation omitted); *see also Demarest v. City of
Vallejo*, 44 F.4th 1209, 1226 (9th Cir. 2022) (holding that an
officer did not violate the Fourth Amendment when she
forcefully removed a suspect from his car and handcuffed
him, even though the plaintiff argued the officer could have
used less force). Nor has Hopson identified factually
analogous authorities that establish "beyond debate" that the
detectives acted unlawfully in pulling him out of the car.

In most cases in which we have found that officers used
excessive force in the course of an arrest, the force used was
gratuitous or violent. *See, e.g.*, *Winterrowd v. Nelson*, 480
F.3d 1181, 1182–83 (9th Cir. 2007) (officers pulled over a
man for driving with invalid license plates and knew that the
man had a shoulder injury, yet "forc[ed] him onto the hood
of the car," "grabbed" his arm and "forced it up," "appl[ying]
greater pressure" even as the suspect "screamed in pain");
*Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)
(officers "forcibly threw [suspect] to the ground" when
investigating her for income tax violations); *Santos v. Gates*,
287 F.3d 846, 849–50, 853–54 (9th Cir. 2002) (officers
performed a take-down maneuver on the suspect, resulting
in broken vertebra and temporary paralysis); *Palmer v.
Sanderson*, 9 F.3d 1433, 1434–36 (9th Cir. 1993) (officers
pushed the suspect—an unarmed 67-year-old man who had

recently suffered a stroke—"with such force that [he] fell over sideways," "fastened [his] handcuffs so tightly around his wrist that they caused [him] pain and left bruises that lasted for several weeks," and ignored his plea to loosen the handcuffs).

We have at times found less egregious police conduct during arrests still to violate the Fourth Amendment. But in these cases, the government interests at stake have been correspondingly lower. For example, in *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011), we found a police officer's use of force violated the Fourth Amendment because it occurred "*after* [the plaintiff] had complied with [the officer's] requests" and after the officer checked his driver's license and license plate number and found "nothing untoward." *Id.* at 1079. The officer in *Liberal* had observed the plaintiff "obeying all traffic laws," had witnessed no conduct suggesting that the plaintiff had violated or would violate any law, and the "[p]laintiff did not pose an immediate threat to anyone's safety." *Id.* at 1068, 1079. With such minimal government interests at stake, the officer's use of force—"grabb[ing] [the plaintiff] by the wrist, pull[ing] him out of the car, sp[inning] him around, and . . . shov[ing] [him] against the door with enough force to rock the car"—was unreasonable. *Id.* at 1069.

Likewise, in *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989), the suspect was taking out her garbage and complying with the law at the time she was arrested. *Id.* at 643. Under her version of the facts, police lacked probable cause to arrest her. *See id.* at 644. We thus concluded that the officers' "rough and abusive" conduct toward her—which required her to seek medical treatment for pain and bruises— might constitute excessive force. *Id.* at 645.

Here, in contrast, Hopson alleges only that he was "forcefully" removed from his vehicle and "forcefully" handcuffed. There is no suggestion that the detectives physically injured Hopson when they extracted him from his car and arrested him. The government's interest in investigating and preventing a potential armed robbery was also substantially greater than the interests at issue in *Liberal* and *Hansen*.

No clearly established law prevented the officers from acting quickly and with moderate force to ensure that Hopson was detained without incident. We cannot conclude that controlling authority has clearly established beyond debate that the amount of force used during Hopson's arrest was objectively unreasonable.

## C

Finally, we reject Hopson's argument that the detectives violated clearly established law in failing to identify themselves as law enforcement officers. Hopson claims that the use of force was unreasonable because he did not know whether Alexander and Grissom were officers arresting him or criminals robbing him. Courts do consider "whether officers gave a warning before employing the force" as one factor in the excessive force analysis. *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011); *see also Nelson v. City of Davis*, 685 F.3d 867, 882–83 (9th Cir. 2012). But the issue here is not so much Detective Alexander's failure to warn as his alleged failure immediately to identify himself as a police officer. On that score, Hopson has not identified clearly established law concerning (1) when an officer must identify himself as such before using the degree of force used here, (2) what form that identification should take, and (3) how the lack of verbal identification is to be weighed against

other considerations. Even pre-force warnings are only required "when feasible, if the use of force may result in serious injury." *Glenn*, 673 F.3d at 876 (quotation omitted).

Hopson has identified three unpublished decisions from this circuit and two cases from other circuits in which officers' failure to identify themselves impacted the excessive force balancing analysis. *See Vlasak v. Las Vegas Metro. Police Dep't*, 213 F. App'x 512, 514 (9th Cir. 2006); *Bryan v. Las Vegas Metro. Police Dep't*, 349 F. App'x 132, 135 (9th Cir. 2009); *Willis v. City of Fresno*, 520 F. App'x 590, 591 (9th Cir. 2013); *Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991).

But even if these cases fully supported Hopson, this authority by its nature likely does not qualify as "controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589–90 (quotations omitted); *see also Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002) ("[I]t will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only."); *Rico v. Ducart*, 980 F.3d 1292, 1301 (9th Cir. 2020) (holding that a "single published opinion" with different facts, "repeated in one unpublished disposition" and "combined with the other three cases from our sister circuits . . . cannot form the basis for a robust consensus" (quotation omitted)).

Regardless, the cases that Hopson cites are materially distinguishable. These cases for the most part involved suspects who resisted arrest, and so whether a suspect's resistance was reasonable—and whether the officers' ensuing use of force was justified—turned on whether the

defendant knew that the people whom they were resisting were law enforcement officers. Moreover, even though an officer's failure to identify himself can be a relevant factor in the Fourth Amendment "reasonableness" analysis, no one factor is considered in a vacuum. Other factors, such as the "type and amount of force inflicted," are still relevant in deciding whether the exercise of force was unreasonable. *See Felarca*, 891 F.3d at 817 (quotation omitted). And in the cases that Hopson cites, the type and amount of force differed materially from that at issue here. *See Bryan*, 349 F. App'x at 135 (police shot the suspect); *Yates*, 941 F.2d at 445 (same); *Sledd*, 102 F.3d at 284 (same); *Willis*, 520 F. App'x at 591 (police shot suspect, killing him); *Vlasak*, 213 F. App'x at 514 (police wrestled the suspect to the ground).

Under the circumstances of this case, precedent does not clearly establish that the detectives' alleged failure to identify themselves as police officers made their use of force excessive.

## D

For its part, the dissent approaches the second prong of the qualified immunity analysis by evaluating whether the law clearly establishes a right to be free of excessive force when Hopson was "merely conversing" with Jones and "posed no threat to the officers or to members of the public." Dissent 47, 50. As we have explained above, that is not a tenable view of the facts. As a consequence, the dissent's analysis under the "clearly established" prong is misdirected.

The dissent focuses our attention on *Andrews v. City of Henderson*, 35 F.4th 710, 714 (9th Cir. 2022), and *Blankenhorn v. City of Orange*, 485 F.3d 463, 478–80 (9th Cir. 2007). Dissent at 45–48. It is telling that Hopson's learned counsel cited neither of these cases in briefing before

us. These cases involve very different facts than this one and certainly do not clearly establish that the officers here used excessive force.

In *Andrews*, detectives watched a suspected robber pass through a metal detector and an x-ray machine at the door to a courthouse, so they "knew that he was not armed." 35 F.4th at 713, 717. This knowledge "mitigated" the "risk of violence" that the suspect posed, so "the government's interest in using substantial force was minimal." *Id.* at 716–17. In addition, the suspect "was not exhibiting any aggressive behavior, and there were no bystanders within his close proximity when he exited the courthouse." *Id.* at 717. The officers nonetheless "lunged at" the suspect and "tackled him to the ground," "result[ing] in an acetabular fracture of [the suspect's] hip, which required two surgeries." *Id.* at 714.

Unlike in *Andrews*, the officers here did not know that Hopson was unarmed. And, in fact, he was armed. *Andrews* also involved someone suspected of a past crime, whereas Detective Alexander perceived Hopson as about to commit one. Nothing about *Andrews* clearly established whether the officers acted unlawfully "in the particular circumstances" they faced in the gas station parking lot. *Wesby*, 138 S. Ct. at 590 (quotations omitted).

In *Blankenhorn*, meanwhile, police officers saw a man in a crowd at the mall, and the officers recalled that mall security had previously banned him from the premises. 485 F.3d at 468. Based on this suspicion of "misdemeanor trespass," the officers "gang-tackled" the man, punched him several times, and placed hobble restraints on his ankles. *Id.* at 478. We held that a jury could find the officers' conduct unreasonable "under th[e] circumstances," since "the

severity of the alleged crime, misdemeanor trespass, was minimal." *Id. Blankenhorn* does not "squarely govern[]" the case at hand, *Brosseau*, 543 U.S. at 201, in which the detectives not unreasonably suspected Hopson of engaging in a much more serious crime.

The dissent also suggests that clearly established law prohibited the force used here because there are factual distinctions between this case and some of the cases we have cited in our analysis, such as *Wesby*. Dissent 48–50. But for the most part, the cases we have relied upon, *Wesby* included, pertain to the standards that govern the qualified immunity analysis or the *Terry* framework that, in this case, presages it. The dissent's mode of analysis is at odds with our long-stated rule "[i]t is the plaintiff who 'bears the burden of showing that the rights allegedly violated were clearly established.'" *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000)). There is no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions. Nor must § 1983 defendants come forward with precedent showing that the *un*lawfulness of their conduct was *not* clearly established.

IV

We appreciate that both sides have different perspectives about the events giving rise to this case. In Hopson's view, although he may not have been permitted to possess a gun, the detectives acted rashly in assuming that he and Jones were planning an armed robbery and aggressively confronting them in the way they did. In the detectives' view, their conduct was not only constitutionally reasonable but commendable, as they presciently surmised that Hopson

was armed.  We of course do not know what would have happened next absent the officers' intervention.

The parties' competing perspectives underscore the competing considerations at stake when law enforcement officers approach a suspect.  Police must be cautious not to point guns at people in haste when the circumstances do not warrant it.  Such conduct can lead to accidents or violent escalations that might not otherwise have occurred.  It can also under our precedents produce harm of a constitutional magnitude, even when no physical injury results.  At the same time, police officers must have some latitude in relying on their judgment and experience to anticipate criminal conduct that may be about to occur.  Officers are allowed and expected to be proactive.  And when they have a basis for intervening, they are not inevitably required to use only the most minimal force and hope for the best.

Though the proper balance between individual rights and public safety is a worthy topic of public discourse, our role here was a limited one.  The doctrine of qualified immunity requires that we not hold police officers to standards that fail to appreciate the real-time nature of their decisions and the sometimes ill-defined nature of Fourth Amendment law.  Our more circumscribed task in this case—and, indeed, our only necessary task—was to determine whether any constitutional violation was clearly established on these facts.  Because it was not, the judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.

**REVERSED AND REMANDED.**

RAWLINSON, Circuit Judge, dissenting:

I respectfully, but emphatically dissent. Viewing the facts in the light most favorable to the plaintiff, as we must, the conclusion is inescapable that DeJuan Hopson was subjected to excessive force and that the officers involved were not entitled to qualified immunity for that use of excessive force. *See Ames v. King Cnty.*, 846 F.3d 340, 347 (9th Cir. 2017).

I start with the facts, taken in the light most favorable to Mr. Hopson. On January 25, 2018, before Mr. Hopson arrived on the scene, Detective Alexander observed an individual named Tommy Jones back into a parking spot, "crane his neck" and "nervously" look around. Detective Alexander was in an unmarked vehicle and was not wearing a uniform. Jones changed parking spots several times, each time "turn[ing] his body 180 degrees in the vehicle to get a good look at his surroundings." Although Jones never exited his vehicle and no weapon was seen, Detective Alexander believed that Jones intended to commit armed robbery of the gas station.

After approximately fifteen minutes Mr. Hopson arrived at the gas station and parked next to Jones. Jones exited his vehicle and entered Hopson's vehicle, where the two began to converse.[1]

---

[1] The majority opinion states that Detective Alexander observed Jones and Mr. Hopson "exchange items," *Majority Opinion*, p. 6, but this observation does not construe the facts in the light most favorable to Mr. Hopson, who asserted that the two were engaged in a private conversation. And in view of Mr. Hopson's assertion that the two were only engaged in conversation, Detective Alexander's statement that the

According to Detective Alexander, once Mr. Hopson arrived on the scene, his suspicion morphed from a potential armed robbery to the more generic "engag[ing] in criminal activity."   Detective Alexander called for backup and, construing the facts in the light most favorable to Mr. Hopson, a total of six officers converged on the scene, with weapons drawn.   According to Mr. Hopson, Detective Alexander approached him "at *gunpoint*" and without any warning, "provocation or resistance" on Mr. Hopson's part, his driver's side door was opened and Detective Alexander "placed his hand on [Mr. Hopson's] left arm, grabbing it with enough force to put [Mr. Hopson] in a state of shock and make [him] think that [he] was being robbed."   Mr. Hopson saw Officer Grissom "standing right in front of [Mr. Hopson's] vehicle with his gun pointed directly at [Mr. Hopson]."   Officer Grissom "forcefully placed [Mr. Hopson] in handcuff[s] and verbally dared [Mr. Hopson] to make a move in resistance to his actions."

To summarize, taking the facts in the light most favorable to Mr. Hopson:  Mr. Hopson was sitting in his vehicle conversing with another individual (Jones) when he was forcefully yanked from his vehicle by his arm, forcefully handcuffed, and confronted by six police officers, all of whom had guns pointed at him, and one of whom "dared [Mr. Hopson] to make a move."   Prior to being forcefully

---

two "exchange[d] items" is not undisputed.  The same is true for the detective's statement that Jones retrieved something from his vehicle and returned to Mr. Hopson's vehicle.  At best, this presents a factual dispute that we may not resolve in this interlocutory appeal.  *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 806-07 (9th Cir. 2003) (explaining that "[i]nterlocutory appeals are not available when the appellate court is required to resolve a *fact*-related dispute" (citation and internal quotation marks omitted) (emphasis in the original).

yanked from his vehicle by his arm, Mr. Hopson had no
knowledge that police officers were present. The officers
did not identify themselves in any way or provide any kind
of warning to Mr. Hopson. The criminal charges brought
against Mr. Hopson were dismissed for lack of probable
cause.

The majority discusses in some detail Mr. Hopson's
criminal history and the results of a search of the vehicle
after Mr. Hopson was detained. *See Majority Opinion*, p. 7.
However, these facts have no place in our qualified
immunity analysis, which focuses on the facts in existence
when the force was used. *See Rice v. Morehouse*, 989 F.3d
1112, 1121 (9th Cir. 2021) (explaining that "[i]n evaluating
a Fourth Amendment claim of excessive force, we ask
whether the officers' actions are objectively reasonable *in
light of the facts and circumstances confronting them*")
(citation and internal quotation marks omitted) (emphasis
added); *see also Shafer v. County of Santa Barbara*, 868
F.3d 1110, 1116 (9th Cir. 2017) (same). Because the officers
were not "confronted" by the facts discovered after the use
of force, those facts cannot justify the amount of force used.
*See id.*

The majority also relies on "the detectives' *suspicion* of
a planned armed robbery" to support the amount of force
used. *Majority Opinion*, p. 13. There are two problems with
this theory. The first is that suspicion alone does not justify
the use of excessive force. *See Shafer*, 868 F.3d at 1116
(observing that in excessive force cases, the question of
whether officers' actions are objectively reasonable is
decided "without regard to their underlying intent or
motivation") (citation omitted). Suspicion justifies an
investigatory stop, not excessive force. *See Terry v. Ohio*,
392 U.S. 1, 15 (1968) (approving "legitimate and restrained

*investigative conduct*") (emphasis added); *see also id.* at 6-7 (noting that the officer "approach[ed] the three men, identified himself as a police officer and asked for their names"). In *Terry*, it was only after the suspects were nonresponsive to the officer's question that he "grabbed . . . Terry, spun him around . . . and patted down the outside of [Terry's] clothing." *Id.* at 7. In this case, Detective Alexander never identified himself as a police officer and never asked a question before proceeding to the use of a substantial degree of force, including guns. *Terry* does not support these actions. *See id.* at 6-7.

The second problem with this theory is that after Mr. Hopson arrived on the scene, Detective Alexander no longer expressed a suspicion that an armed robbery was about to occur. Rather, he stated in his declaration that "it was clear" that "Jones and Hopson *were engaged in criminal activity*." (emphasis added). Detective Alexander made absolutely no reference to armed robbery at this point. The majority posits that "[i]n context, it is clear that the 'criminal activity' to which Detective Alexander was referring was the only criminal activity he had mentioned in his declaration; the planning of an armed robbery." *Majority Opinion*, pp. 15-16. But that inference is far from clear, especially in view of the majority's reference to Detective Alexander's belief that Mr. Hopson and Jones "exchange[d] items" and to "the marijuana odor coming from the car." *Majority Opinion*, pp. 6-7. In context, it is equally "clear" that Detective Alexander suspected a crime involving marijuana. *See id.* At best, a question of fact is presented, which cannot be resolved in this interlocutory appeal. *See Cunningham*, 345 F.3d at 806-07. And the record confirms that the crime suspected by Detective Alexander after Mr. Hopson's arrival was indeed

unspecified.  Otherwise, there would be no need to resort to context and inference.[2]

The majority also notes that "[n]othing in Detective Alexander's declaration indicates that he no longer believed an armed robbery was in the works or that his suspicions had abated."  *Majority Opinion*, p. 16.  But the converse is also true:  Nothing in Detective Alexander's declaration indicates that he continued to believe an armed robbery was in the works or that his suspicions regarding a pending armed robbery continued.

At bottom, Mr. Hopson and Jones posed no "*immediate threat*" to the public, when the facts are construed in the light most favorable to Mr. Hopson.  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (citation omitted) (emphasis added).  After all, if the threat were immediate, Detective Alexander would not have had time to call for backup and wait for the backup to arrive.  And although officers are not prevented from "using the element of surprise," *Majority Opinion*, p. 18, officers may not use the element of surprise to employ excessive force.  *See Ames*, 846 F.3d at 348 (emphasizing that "[u]nder the Fourth Amendment, officers may use only such force as is objectively reasonable under the circumstances") (citation and internal quotation marks omitted).

---

[2] The majority makes the point that Detective Alexander only noticed the marijuana smell once he confronted Mr. Hopson.  *See Majority Opinion*, p. 16, n.2.  But the "exchange [of] items" and "the marijuana odor" are part of the "context" on which the majority opinion relies.  The declaration said what it said, and the fact that the majority and the dissent are using context to fill in the gaps solidifies the existence of a factual dispute that cannot be resolved at this stage of the proceedings.  *See Cunningham*, 345 F.3d at 806-07.

I readily acknowledge that when reviewing claims of excessive force, we must remain mindful that police officers are often presented with situations where split-second decisions must be made "in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). However, no split-second decisionmaking was required under the circumstances of this case, when Mr. Hopson and Jones were completely unaware of the presence of the officers. In addition, Detective Alexander had time to call for backup and wait for their arrival, a clear indication that no urgency existed.

My esteemed colleagues in the majority accuse me of misapprehending the record. *See Majority Opinion*, p. 14. Not so. As governing precedent dictates, I construe the record in favor of Mr. Hopson's version of events rather then in favor of the officer's version of events. *See Cunningham*, 345 F.3d at 807-08. For example, the majority takes issue with my repeating Mr. Hopson's statement that he and his friend were sitting in a car conversing, in view of Detective Alexander's statement that they were doing more than conversing. But Detective Alexander's statement creates a factual dispute, which precludes resolution of the qualified immunity question in this limited interlocutory appeal. *See id.* at 806-07.[3]

---

[3] The existence of a dispute is made even more apparent by the majority's statement that "Hopson has not contested that he and Jones exchanged items or that Jones went back to his vehicle to retrieve something." *Majority Opinion*, p. 15. In the qualified immunity inquiry, Hopson has no burden to "contest" any version of the facts advanced by the officers. *See Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003). Rather, all facts are construed in his favor. *See id.* at 1184 (concluding that the district court "failed to view the evidence in the light most favorable to

When analyzing claims of excessive force under *Graham*, we consider the following factors:

1. "[T]he severity of the crime at issue";

2. "[W]hether the suspect poses an *immediate* threat to the safety of the officers or others";

3. "[W]hether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."

*Felarca*, 891 F.3d at 817 (quoting *Graham*, 490 U.S. at 396) (emphasis added).

"We may also consider the availability of less intrusive alternatives to the force employed and whether warnings were given." *Id.* (citation omitted).

Of the factors we are to consider in assessing whether the force used by the officers was excessive "the most important [factor] is whether the suspect posed an *immediate threat* to the safety of the officers or others." *Id.* (citation omitted) (emphasis added).

Application of these factors to the case before us leads to the inescapable conclusion that the force used against Mr. Hopson was excessive. Starting with the most important factor, and viewing the evidence in the light most favorable to Mr. Hopson, the record does not contain facts indicating the existence of an immediate threat to the officers or to anyone else. *See id.* Mr. Hopson and Jones were sitting in a car conversing. No weapons were visible and neither occupant of the vehicle resisted arrest or attempted to

---

the plaintiff" when it relied on "uncontradicted" declarations from the officers to grant qualified immunity) (citation omitted).

impede the officers in any way. Under these facts, this "most important" factor weighs in favor of a finding of excessive force. *Id.; see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091-92 (9th Cir. 2013) (weighing factors and concluding that excessive force was used after construing the facts in favor of the plaintiff).

Turning to the other factors viewed in the light most favorable to Mr. Hopson, the conclusion that the force used was excessive becomes even clearer. At the time Detective Alexander forcefully yanked Mr. Hopson from his vehicle, the detective had articulated that he only suspected Mr. Hopson and Jones of being "engaged in criminal activity,"[4] without any greater specificity. With no indication in the record that a crime involving a potential use of force was being committed or threatened, this factor weighs in favor of a finding that excessive force was used.[5] *See id.*

Viewing the evidence in the light most favorable to Mr. Hopson, it is indisputable that neither Mr. Hopson nor Jones "actively" resisted arrest or "attempt[ed] to evade arrest by flight." *Felarca*, 891 F.3d at 817 (citation omitted). According to Mr. Hopson, one of the officers "dared [Mr.

---

[4] Before Mr. Hopson arrived, Detective Alexander articulated his belief that Jones (not Mr. Hopson) was preparing to commit an armed robbery of the gas station. However, this belief was not repeated after Mr. Hopson's arrival.

[5] It is questionable whether Detective Alexander's unsubstantiated speculation that Mr. Hopson and his companion were "engaged in criminal activity" is even a fact for purposes of our analysis. *See Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (emphasizing that "[t]he officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity") (quoting *Terry*, 392 U.S. at 27) (internal quotation marks omitted).

Hopson] to make a move in resistance to [the officer's] actions." This factor weighs strongly in favor of a determination that excessive force was used. *See Gravelet-Blondin*, 728 F.3d at 1091-92.

Finally, we may consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Felarca*, 891 F.3d at 817 (citation omitted). It is undisputed that no warnings were given, and the existence of a less intrusive alternative is embodied in the seminal *Terry* case, which authorizes officers to conduct an investigatory stop when there is a reasonable suspicion that criminal activity is afoot, but no probable cause to support a conclusion that a specific crime has been or is about to be committed. *See* 392 U.S. at 20 (clarifying that the court was not addressing whether probable cause existed). The officers do not argue that probable cause existed to detain Mr. Hopson. But they, unfortunately, skipped the investigatory stop, which would have been justified, and proceeded to detention and the use of force, which were not justified under the facts viewed in the light most favorable to Mr. Hopson. Because no warnings were given before Mr. Hopson was forcefully yanked from his vehicle at gunpoint and because a *Terry* stop was a less intrusive alternative available to the officers, this factor supports the conclusion that the officers used excessive force. *See Andrews v. City of Henderson*, 35 F.4th 710, 717-18 (9th Cir. 2022).

So every factor that we and the Supreme Court have articulated to assist in our determination of whether excessive force was used supports the inescapable conclusion in this case that the force used against Mr. Hopson was indeed excessive.

I am well aware that the factors set forth by our court and the Supreme Court should not be applied in a mechanical manner, and I have not done so. Rather, I applied the factors to the specific facts of this case, construed in the light most favorable to Mr. Hopson. As mentioned previously, there was no split-second decisionmaking that would temper our application of the applicable factors, or any other exigent circumstances that would ameliorate the use of excessive force in this case. *See e.g., Ames*, 846 F.3d at 349 (describing "a rapidly escalating situation").[6]

I am not persuaded that cases discussing *Terry* and its progeny may be substituted for application of the factors set forth by our court and the Supreme Court to assess whether the amount of force used in this case was excessive. Even so, those cases contain facts that are nowhere close to the facts of this case, where force was used against Mr. Hopson and Jones when they were merely conversing in a vehicle.

For example, in *Wardlow*, the Supreme Court addressed a "stop and frisk" situation, not a circumstance involving a suspect subjected to force, including the pointing of weapons. *See* 528 U.S. at 121 (noting that the officer "conducted a patdown search for weapons"). Indeed the Supreme Court cited *Terry*, rather than excessive force cases in concluding that "an officer may, consistent with the Fourth Amendment *conduct a brief, investigatory stop* when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Id.* at 123 (citing *Terry*, 392 U.S. at 30) (emphasis added). Nothing in this language supports the level of force used against Mr. Hopson.

---

[6] Tellingly, the majority never applies these factors to the facts of this case.

Under *Wardlow* and *Terry*, Detective Alexander and the other officers were authorized to conduct an investigation. But that is not what they did. They skipped past the investigation and proceeded directly to the use of force including the pointing of weapons. *See Wardlow*, 528 U.S. at 121 (noting that the officer "conducted a protective patdown search for weapons").[7]

Because Detective Alexander and the other officers proceeded directly to the use of force, we must apply the analysis set forth by the Supreme Court and applied in this Circuit to determine if the force used was excessive. *See Graham*, 490 U.S. at 396; *see also Felarca*, 891 F.3d at 817. Having done so, and with all applicable factors weighing in favor of a conclusion that excessive force was used, I proceed to a discussion of whether the right to be free of the use of excessive force is clearly established when there is no probable cause to believe a crime has been committed, and the suspect poses no immediate threat to himself, the officers, or members of the public. In this circumstance, our precedent clearly establishes that the use of excessive force violates the individual's constitutional rights.

In making the determination of whether a principle of law is clearly established, we look to cases with similar (not identical) facts. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("stress[ing] the need to identify a case where an officer act[ed] under *similar* circumstances") (citations and internal quotation marks omitted) (emphasis added). Contrary to the majority's reading of our precedent,

---

[7] The majority's continued reliance on *Terry* to justify a non-*Terry* encounter finds no support in excessive force precedent. *See e.g. Felarca*, 891 F.3d at 817 (setting forth the factors to be weighed in an excessive force analysis); *see also Graham*, 490 U.S. at 396 (same).

I view our precedent as clearly establishing use of force as excessive when officers confront a suspect that presents no threat to the safety of the officers or to the safety of the public.

Our recent decision in *Andrews* affirmed a similar denial of a motion for summary judgment predicated on qualified immunity. *See* 35 F.4th at 713. In that case, detectives had probable cause to arrest Andrews for armed robberies. *See id.* They followed Andrews to the municipal courthouse. *See id.* Because Andrews was required to go through a metal detector before entering the courthouse, detectives were aware that he was unarmed. *See id.* When Andrews reemerged from the courthouse, two detectives slowly approached him without identifying themselves. *See id.* With no provocation or warning, one of the detectives "lunged and tackled [Andrews] to the ground." *Id.* at 714. The second detective "landed on top" of Andrews and the first detective, remaining there until Andrews was handcuffed. *Id.*

Even though the officers had probable cause to arrest Andrews for armed robbery, we concluded that "the government's interest in using substantial force was minimal." *Id.* at 716. We reasoned that we must consider "the full context that the officers faced, including that Andrews was not engaged in any violent or nonviolent criminal conduct when he was tackled without warning by the detectives." *Id.* at 716-17. We also noted that the evidence in the record did not indicate that Andrews "otherwise posed a threat to the officers or members of the public." *Id.* at 717. We noted that Andrews "was not exhibiting any aggressive behavior, and there were no bystanders within his close proximity." *Id.* "And because Andrews did not know the detectives' identities before they

tackled him, there is no dispute that he was not resisting arrest or attempting to flee." *Id.* Given these facts, we concluded that "the nature of Andrews's suspected crime [armed robbery] [did] not establish a strong governmental interest in using significant physical force against him." *Id.* We emphasized that "the serious nature of a suspected crime does not *necessarily* give rise to a strong governmental interest in the use of significant physical force." *Id.* (citation omitted) (emphasis in the original). Rather, "[o]ur precedent requires that we focus on the *immediate* threat of harm. That is, we consider the danger a suspect poses *at the time force is applied*." *Id.* (citations and internal quotation marks omitted) (emphases in the original). We reiterated that "although Andrews was suspected of a serious crime, viewing the evidence in his favor, . . . any immediate threat to safety was minimal, [and] the nature of the crime at issue provide[d] little, if any, basis for the officers' use of physical force." *Id.* at 717-18 (citation and internal quotation marks omitted).

We then proceeded to our discussion of whether the constitutional right asserted was clearly established. *See id.* at 718. We cited our prior decision of *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) and other similar cases in concluding that the detectives involved in the "surprise takedown" of Andrews had "ample notice" that their actions "violated Andrews's Fourth Amendment rights." *Id.* at 720. We determined that "it was clearly established before the events of this case [in 2017] that the Fourth Amendment prohibits multiple officers from physically tackling a relatively calm suspect without providing any warning where the suspect is not posing an immediate danger to anyone, resisting arrest, or trying to flee

unless the officers first attempt a less intrusive means of arrest." *Id.* (citation and internal quotation marks omitted).

The similarity between the facts of this appeal and those in *Andrews* is undeniable. If anything, the facts in favor of qualified immunity were stronger in Andrews because officers had probable cause to arrest Andrews for armed robbery. *See id.* at 713. In contrast here, although Detective Alexander expressed a "belief" that Jones was about to engage in armed robbery, by the time Mr. Hopson arrived on the scene, the "belief" had shifted to the observation that the two individuals "were engaged in [some unspecified] criminal activity," and nothing close to probable cause existed.

As in *Andrews*, viewed in the light most favorable to Mr. Hopson, he posed no threat to the officers or to members of the public. *See id.* at 717. Mr. Hopson "was not exhibiting any aggressive behavior," and "there is no dispute that he was not resisting arrest or attempting to flee." *Id.* Thus, as in *Andrews*, *at the time the force [was] applied*, *id.*, Mr. Hopson did not pose an "*immediate* threat of harm." *Id.* (emphases in the original). Mr. Hopson was yanked from his car forcefully and at gunpoint, and forcefully handcuffed without any advance warning. As in *Andrews*, our prior precedent gave "ample notice" that this "surprise takedown" violated Mr. Hopson's right to be free from such significant force under these circumstances. *Id.* at 720.

The *Blankenhorn* case cited in *Andrews* was deemed sufficiently similar to the facts in *Andrews* because "[in] both cases, the suspects posed no *immediate* threat to the officers or public safety when they were arrested." *Id.* at 719 (emphasis in the original). And, we noted in *Andrews*, "other than the nature of the suspected crime, the facts of this

case [Andrews] are either analogous to or more favorable to Andrews than the facts in *Blankenhorn*." *Id.* In turn, taking the facts in the light most favorable to Hopson, Hopson's case is even more favorable. The officers had no probable cause to believe Hopson had committed any crime, there was no immediate threat of violence to the officers or to the public, and Hopson did not resist in any way, or attempt to flee. Under these facts, it was clearly established under *Blankenhorn* and *Andrews* that the "Fourth Amendment prohibits" use of anything other than "non-trivial force" without warning when "the suspect is not posing an immediate danger to anyone, resisting arrest, or trying to flee unless the officers first attempt a less intrusive means of arrest." *Id.* at 719-20.

Our decision in *Alexander v. County of Los Angeles*, 64 F.3d 1315 (9th Cir. 1995) does not support a grant of qualified immunity in this case. Indeed, the portion of the decision addressing excessive force reversed summary judgment in favor of the officers. *See id.* at 1323. We concluded that "it cannot be said as a matter of law that the officers' use of force was reasonable" when the suspect "was slammed against a car, his legs kicked apart, and . . . he was carried and pushed into the back of the police car." *Id.* at 1322-23. Neither does the Supreme Court's decision in *Wesby* support a determination of qualified immunity for the officers who used excessive force against Hopson. For starters, *Wesby* involved a claim of false arrest rather than one of excessive force. *See* 138 S. Ct. at 584. Consequently, the dispositive issue was whether the officers had probable cause to arrest partygoers who were partying in a house they had no permission to enter. *See id.* at 583-84. After concluding that the officers had "probable cause to believe the partygoers knew they did not have permission to be in

the house," *id.* at 588, the Supreme Court reversed the D.C. Circuit's denial of qualified immunity. *See id.* at 593. In doing so, the Supreme Court emphasized "the circumstances with which the officers were confronted," and the "lack of similar circumstances" in existing cases addressing probable cause. *Id.* at 591 (citations and alteration omitted).

The Supreme Court observed that "[t]he officers found a group of people in a house that the neighbors had identified as vacant, that appeared to be vacant, and that the partygoers were treating as vacant. The group scattered, and some hid, at the sight of law enforcement. Their explanations for being at the house were full of holes. The source of their claimed invitation admitted that she had no right to be in that house, and the owner confirmed that fact." *Id.* In light of these damning facts, the Supreme Court concluded that even if "the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they reasonably but mistakenly concluded that probable cause was present." *Id.* (citation, alterations and internal quotation marks omitted). No similar argument can be made for the officers who used force against Hopson because they did not conclude, mistakenly or otherwise, that probable cause existed to arrest Hopson. And no similar damning facts informed the decision to use force against Hopson because, unlike the officers in *Wesby*, the officers who used force against Hopson never conducted any investigation before proceeding to yank him from his vehicle at gunpoint and forcefully handcuff him. In sum, *Wesby* does not present "similar circumstances," *id.*, and therefore provides no basis for a grant of qualified immunity to the officers who used excessive force against Hopson. *See id.* There simply are no "similar circumstances" between the facts and circumstances in the *Wesby* case and the facts and

circumstances leading to the use of excessive force against Hopson.

The same lack of similar circumstances exists for the case of *Demarest v. City of Vallejo*, 44 F.4th 1209, 1213, 1225 (9th Cir. 2022) (addressing whether an officer "violated the Fourth Amendment by using excessive force in effectuating [an] arrest" at a sobriety checkpoint after Demarest "declined an officer's repeated demands to show his license.").

Finally, the majority mentions that our precedent denying qualified immunity mostly involves cases where the force used by the officers was "gratuitous or violent." *Majority Opinion*, p. 26. I agree. And under this standard, the officers who used force against Hobson are not entitled to qualified immunity because the force used against Hopson was both gratuitous and violent. *See Andrews*, 35 F.4th at 720. In sum, under the facts of this case, viewed in the light most favorable to Hopson, the officers violated clearly established law when they forcefully yanked Hopson from his vehicle at gunpoint without warning, and forcefully handcuffed him, when he was merely conversing with Jones and posed no immediate threat to the officers or to the public. *See id.* Because the officers who used this gratuitous and violent excessive force against Hopson were not entitled to qualified immunity, I would affirm the district court's judgment denying qualified immunity.

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Mary V. Sooter
MARY V. SOOTER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventh Street, Suite 2600
Denver, CO 80202
(720) 274-3133